UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROBERT MILLER, | : | |
|     Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:19CV1997(JCH) |
| v. | : | |
| | : | |
| LEA PANNELLA, et al., | : | JUNE 23, 2021 |
|     Defendants. | : | |

**RULING ON MOTION FOR SUMMARY JUDGMENT (DOC. NO. 52)**

On December 20, 2019, the plaintiff, Robert Miller, a sentenced[1] inmate in the custody of Connecticut Department of Correction ("DOC"), filed this action pro se and in forma pauperis against medical staff at MacDougall-Walker Correctional Institution ("MacDougall"): Dr. Lea Pannella, D. Brown, John Doe 1, Jane Doe 1, and Jane Doe 2 in connection with his medical treatment. Compl. (Doc. No. 1).

In an Initial Review Order ("IRO"), the court construed the Complaint to assert Eighth Amendment violations based on deliberate indifference to his medical needs with respect to side effects of certain medication, but the court determined that Miller had not stated any plausible Eighth Amendment claims. IRO (Doc. No. 11 at 7). However, the court permitted Miller to file an amended complaint if he could satisfy the deficiencies identified in the Initial Review Order. Id.

---

[1] The court takes judicial notice of the public record located at the Connecticut DOC website showing that Miller is currently housed at Garner Correctional Institution serving a nine-year sentence. See Robert Miller, No. 303392, Conn. Dep't of Corr., http://www.ctinmateinfo.state.ct.us/ (search CT DOC Inmate Number field for "303392"). The Court may "take judicial notice of relevant matters of public record." Giraldo v. Kessler, 694 F.3d 161, 164 (2d Cir. 2012).

On May 26, 2020, Miller filed his Amended Complaint against three medical staff members at MacDougall: Dr. Zahedi, APRN or Dr. Barbra ("Barbra"), and Jane Doe, an assistant to Dr. Zahedi. Am. Compl. (Doc. No. 12). Upon initial review of the Amended Complaint, the court permitted Miller's Eighth Amendment individual capacity claims for damages to proceed against Dr. Zahedi and APRN or Nurse Barbra. IRO on Am. Compl. (Doc. No. 14).[2]

On February 25, 2021, the defendants filed their Motion for Summary Judgment on Miller's Amended Complaint. Mot. for Sum. Judg. (Doc. No. 52). In support of their Motion for Summary Judgment, the defendants have filed a Memorandum of Law (Defs.' Mem. (Doc. No. 52-1)) and a Local Rule 56(a)1 Statement of Facts (Defs.' Rule 56(a)1 (Doc. No. 52-1)) with supporting exhibits. Miller has filed an opposition to the Motion for Summary Judgment (Pl.'s Obj. (Doc. No. 55)), which includes a statement of facts and exhibits.

## I. Miller's Amended Complaint

In his verified Amended Complaint, Miller alleged that he was housed at MacDougall between 2016 and 2107, and during this time was taking mental health medication.[3] Am. Compl. (Doc No. 12 at ¶ 1). He allegedly wrote to the mental health unit and spoke with Dr. Zahedi about his past history and concern about the side effects

---

[2] The claim against Jane Doe was dismissed on initial review. Id.

[3] An inmate request form with a return date of July 31, 2017, indicates that Miller was seen on July 16, 2017, about his mental health medication and its effects on his white blood cell count. Id. at p. 10.

2

of the medication.  Id.  However, Dr. Zahedi never ran a test and kept on prescribing him the same mental health medication.  Id.

Miller claims that he sought, without success, a determination of what medication he should use that would not lower his white blood cell count to a level where he could not fight infections.  Id. at ¶ 2.  He maintains that he had several discussions with both the medical and mental health units about his health concerns and his medical records showing health had declined while he was taking the prescribed mental health medication.  Id. at ¶ 3.  Miller allegedly experienced foam in his mouth, bloody stool, stomach pain, burning tears and weight gain.  Id. at ¶¶ 3-4.  Nevertheless, the medical unit allegedly did not see any warning signs that he was experiencing dangerous side effects from his medication.  Id.

After Miller allegedly experienced his throat closing and that he could not breathe, APRN Barbra took an x-ray, which showed swelling in his neck.  Id. at ¶ 4. After he was sent to UConn, the doctors allegedly told him that his white blood cells were dangerously low.  Id.  He allegedly informed Dr. Zahedi and Barbra about this result, and Dr. Zahedi was thereafter supposed to obtain Miller's medical records from Yale-New Haven and UCONN hospitals; however, there was allegedly no follow up and Miller's medication was not changed.  Id.  Miller's case worker also allegedly talked to Dr. Zahedi about the damage to Miller's health due to the mental health medication, and the case worker made a note in the computer for Dr. Zahedi about the issue.  Id. at ¶¶ 6-7.

When Miller met with Dr. Zahedi and APRN Barbra, they allegedly told him to stop filing grievances because there was nothing wrong. Id. at ¶ 9.

During his intake at Cheshire Correctional Institution ("Cheshire"), Miller was allegedly taken off of the mental health medication that Dr. Zahedi had prescribed and that APRN Barbra would not test to determine its side effects to Miller. Id. at p. 6. The doctor said that it would take time for him to heal, but Miller did get better after being taken off the medication. Id. Miller alleges that Dr. Zahedi and Barbra should have known to take Miller off of the mental health medication based on the indicators on DOC medical results screen. Id.

After the court permitted Miller's Eighth Amendment claims to proceed beyond initial review, the court sent requests for waiver of service for the Amended Complaint on Dr. Zahedi and Barbara Kimbell Goodman, which were both returned as executed on August 19 and 26, 2021, respectively. Waivers (Doc. Nos. 16, 19). These defendants filed an answer on November 26, 2020. Answer (Doc. No. 26).

Both parties agree that APRN Kimble-Goodman, who started working at MacDougall in May 2019, did not have any personal involvement with Miller's medical treatment in 2016 through 2017, relevant to the claims made in the Amended Complaint.[4] See Defs.' Mem. at 5-7; Defs.' Rule 56(a)1 at ¶ 5; Pl.'s Opp. at 2. Both

---

[4] A plaintiff seeking to recover money damages under section 1983 from a defendant in his or her individual capacity must demonstrate "the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). The Second Circuit has defined "personal involvement" to mean direct participation, such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts." Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001) (citation omitted).

4

parties also agree that the individual who was involved with Miller's treatment was Barbara Lafrance. Pl.'s Opp. at 2; Defs.' Response at 2 (Doc. No. 59). Pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(iii), the court will consider whether the present record shows that Miller can assert a plausible claim against Lafrance.[5]

## II.   FACTUAL BACKGROUND[6]

Miller commenced his incarceration for his nine-year sentence at the MacDougall on March 30, 2016. Defs.' Rule 56(a)1 at ¶ 2.

On August 25, 2017, Miller was transferred to Cheshire Correctional Institution ("Cheshire"). Id. at ¶ 3. On December 5, 2018, Miller was transferred to the Robinson Correctional Institution ("Robinson"). Id. at ¶ 4.

The medical record reflects that APRN Barbara Lafrance requested blood tests and x-rays on behalf of Miller at the time relevant to this matter. Id. at 9; see Defs.' Ex.

---

[5] Section 1915(e)(2)(B)(i)-(iii) permits the court to dismiss at any time claims that are not plausible or that are frivolous.

[6] Miller has filed a statement of facts, but it does not respond to the Defendants' Local Rule 56(a)1 statement of facts as required under Local Rules 56(a)2 and (3), which require that "each denial in an opponent's Local Rule 56(a)2 Statement be "followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." Local Rule 56(a)2 and 3; See Obj. (Doc. No. 55 at 10-12).

Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." The Defendants informed Miller of this requirement in their Notice to Pro Se Litigant. See Notice (Doc. No. 52-11). However, the court may consider the allegations of Miller's verified Amended Complaint (Doc. No. 12) and his exhibits. See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e).").

C (Doc. No. 48) (Blood Screening Reports); Ex. D (Doc. No. 49) (X-Ray Reports).   In 2010, Miller was placed on medication that affected his white blood cells which he subsequently discovered in 2013.   Defs.' Rule 56(a)1 at ¶ 11; Defs.' Exhibit F at 4-5 (Pl.'s Inmate Requests).   Miller's white blood cell count was tested thirteen times between on March 22, 2016, and June 12, 2020, and the results reflected a white blood cell count from between a low of 2.5 on October 6, 2017 to a high of 3.6 on March 22, 2016.[7]   Id. at ¶¶ 12-13; Defs.' ex. C.

Miller was diagnosed with Neutropenia or Benign Leukopenia[8] and was provided literature about this blood condition.   Id. at ¶¶ 14-15; Defs.' ex. E (Doc. No. 50) (Medical Reports); Defs.' ex. G (Doc. No. 52-9) (Medical Literature).

From October 2016, through February 2018, Miller took several different mental health medications.   Defs.'s Rule 56(a)1 at ¶17; Defs.' ex. H (Doc. No. 51) (Physician Orders).   On December 18, 2016, Miller was seen in the medical unit for complaints of low white blood cell count; a medical note signed by a RN Brown indicates that he was reassured that he had no signs of infection.   Defs.' Rule 56(a)1 at ¶ 18; Defs.' ex. E at 2-3.

On April 20, 2017, Miller was seen in the medical unit for complaints about his throat being sore and breathing issues.   Defs.' Rule 56(a)1 at ¶ 19; Defs.' ex. E at 4-5.

---

[7] 3/22/2016 (result 3.6); 10/4/2016 (result 3.5); 10/27/2016 (result 3.4); 11/29/2016 (result 3.4); 4/4/2017 (result 3.2); 4/25/2017 (result 3.0); 10/6/2017 (result 2.5); 11/7/2017 (result 3.0); 1/19/2018 (result 3.1); 4/19/2018 (result 2.7); 3/11/2019 (result 2.8); 12/6/2019 (result 3.0); 6/12/2020 (result 3.4).   Id.

[8] Leukopenia "is almost always related to a decrease in a certain type of white blood cell (neutrophil)."   See https://www.mayoclinic.org/symptoms/low-white-blood-cell-count/basics/definition/sym-20050615.

6

On April 27, 2017, Miller had x-rays of his neck taken.   Defs.' Rule 56(a)1 at ¶ 20; Defs.' ex. D at 5-6.   Thereafter, the Utilization Review Committee ("URC") considered Miller's Ear Nose and Throat disorder and approved additional testing with consultation.   Defs.'s Rule 56(a)1; Defs.' ex. E at 6.

On July 12, 2017, Miller was seen at UCONN Health Center for a Gastroenterology consultation about his difficulty swallowing and difficulty breathing. Defs.' Rule 56(a) at ¶ 22; Defs.' ex. E at 8-9.   At this visit, Miller stated that all of his symptoms had resolved three weeks earlier.   Id.

### III.   STANDARD OF REVIEW

A motion for summary judgment will be granted if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986). If the moving party satisfies that burden, the nonmoving party must set forth specific facts demonstrating that there is a genuine issue for trial.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).   A genuine issue exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor.   See, e.g., Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (citing Anderson, 477 U.S. at 252).

The court's role at summary judgment "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact."   O'Hara v. Nat. Union Fire Ins. Co. of Pittsburgh, 642 F.3d 110, 116 (2d Cir. 2011).   Unsupported allegations do not

create a material issue of fact and cannot overcome a properly supported motion for summary judgment. See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996). Rather, a party opposing summary judgment "must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). The evidence offered in opposition to a motion for summary judgment must be both admissible and must be sufficient to raise a genuine issue of material fact. See LaSalle Bank National Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005); Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001).

## IV. ANALYSIS

The court construes the Amended Complaint as asserting Eighth Amendment claims of deliberate indifference to medical needs based upon the defendants' refusal to take Miller off medication that affected his white blood cell count and that caused his throat to close. Initial Review Am. Compl. at 5 (Doc. No. 14); Am. Compl. at ¶¶ 1-10 (Doc. No. 12).

In Estelle v. Gamble, 429 U.S. 97 (1976), the United States Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." Id. at 104 (internal quotation marks and citation omitted). The Court explained that

"[t]his is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. at 104-105.

Deliberate indifference to serious medical needs occurs when an official knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. Harrison v. Barkley, 219 F.3d 132, 137–38 (2d Cir. 1998) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In order to state a deliberate indifference claim, the plaintiff must allege both that his medical need was serious and that the defendants acted with a sufficiently culpable state of mind. See Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (citing Estelle, 429 U.S. at 105). Objectively, the alleged deprivation must be "sufficiently serious." Wilson v. Seiter, 501 U.S. 294, 298 (1991). The condition must be "one that may produce death, degeneration, or extreme pain. See Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks omitted). Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted). Moreover, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. 25, 36 (1993).

"[M]ere medical malpractice is not tantamount to deliberate indifference," although medical malpractice may constitute deliberate indifference when it "involves culpable recklessness, i.e., a conscious disregard of a substantial risk of serious harm." Chance, 143 F.3d at 703 (citing Hathaway, 99 F.3d at 553) (internal quotation marks omitted).  Likewise, "mere disagreement over [an inmate's] proper treatment does not create a constitutional claim," and "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."  Id.; see also Estelle, 429 U.S. at 107 ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice, and as such the proper forum is the state court ...."); Ferrera v. Fisher, 06 Civ. 1158, 2008 WL 4443920 at *14 (S.D.N.Y. Sept. 30, 2008) (No deliberate indifference where plaintiff had not "provided evidentiary support for his conclusory statements that he is a good candidate for surgery, that additional specialists referrals were warranted or that the various tests performed and treatments prescribed did not constitute adequate treatment.").

The court assumes for purposes of ruling on this Motion that Miller's low white blood cell count constitutes a serious medical condition that satisfies the objective component of the Eight Amendment analysis.

Relevant to the subjective component, Miller argues that the defendants did not provide him with proper medical attention after they learned that "something serious

was going on." Pl.'s Opp. at 2.  Specifically, he asserts that the record only shows routine blood tests, x-rays and medication, but no "treatment" or "diagnosis," and he suggests that he was not provided with appropriate treatment due to racism.[9]  Id. at 2-4, 5.  He maintains that his medical history from 2013-2014 concerning his stay at Yale-New Haven Hospital when he was taken off of a Depakote due to its effects on his white cell count made it so obvious that a lay person would know that he had a serious need for treatment.[10]  Id. at 3-4, 8.  He claims that "nothing was done to stop what was happening" even after the computer alerted the defendants "multiple times" to his low blood count.  Id. at 7.  He states that the defendants "disregarded the serious harm [he] was in, injuries [he] had, serious harm [he] could face or death by having low white blood cells."  Id. at 8.  Miller claims that he "could've died because [of] the[ir] recklessness and total disregard for the serious ness of [his low blood cell count] as if [he] had H.I.V. or A.I.D.S."  Id.  In his Statement of Facts, he asserts that the defendants never "tested [him] to see which medication had a side effect . . . like Depakote" and that he was reassured nothing was wrong but his hematology report showed there was "something wrong to point reasonable doctors said they need to . . . resolve the problem."  Id. at 11.

---

[9] This assertion of racism may stem from a medical exam by APRN Tim Bombard on June 11, 2020; a medical note from APRN Bombard indicates that Miller stated he "was told" that his low white blood cell count could kill him," that he was informed that it was "likely a normal low for him," that he was "educated about higher incidence of benign leukopenia in people who have African heritage, and that he thereafter "implied" that APRN Bombard had made a racist statement.  Id. at 46.  However, APRN Bombard is not a defendant in this action, and this treatment occurred at a time not relevant to Miller's claims in this action.

[10] Medical records dated November 17, 2017, and July 12, 2017, show that Miller was noted as being allergic to Depakote, but there is no indication that Miller was prescribed Depakote by the defendants or that he was taking Depakote at the time relevant to this action.  Id. at 45, 51.

However, the present record fails to present facts on which a reasonable jury could find that either defendant acted with deliberate indifference. Miller had six tests for his white blood cell count prior to his transfer to Cheshire on August 25, 2017. See Defs.' Local Rule 56(a)1 at ¶ 13; Defs.' ex. C. After he reported concerns about his low blood cell count on December 18, 2016, at the medical unit, medical staff reassured him that he did not have an infection. See Defs.' Local Rule 56(a)1 at ¶ 18; Defs.' ex. E at 2-3. A medical note dated December 18, 2016, indicates that medical mental health staff reviewed Miller's health record and discussed his white blood cell count and mental health coping methods after he told medical staff: "I know something is up. My numbers keep staying low." Pl.'s Opp. at 57. Later, when he was seen for complaints about his sore throat and breathing trouble, he had x-rays of his neck and was provided with a Gastroenterology consultation. See Defs.' Local Rule 56(a)1 at ¶ 19; Defs.' ex. E at 6. In a Level-1 Grievance received on December 9, 2017, Miller complained about his low white blood cell count was due to his mental health medication, but the response thereto stated that he was seen and evaluated. Id. at 73. A medical note dated July 16, 2017, reflects that Miller complained: "My white blood cells are low because of the mental health medication" and that he wanted to know how "bad" his mental health medications were affecting his white blood cells. Id. at 54; see also id. at 58 (medical note dated 6/23/17, describing Miller's concern that he was going to die due to low blood cell count caused by mental health medication); id. at 55 (medical note indicating Miller requested mental health medication that did not harm his white blood cell count).

12

As the medical record reflects, Miller premises his claims of deliberate indifference on his own determination that he was provided with only "routine" or inadequate treatment for his low white blood cell count and that he should have been provided with further testing. Plaintiff has submitted his inmate request forms showing that he was provided with medical attention when he complained that: he was "put on meds that killed most of [his] white blood cells" in 2010 and now his "white blood cells are still low" and "not getting any better[;]" "[his] mental health meds are attacking [his] white blood cells[;]" he "was throwing up every day for the past 3 weeks;" and he felt like his "throat is closing[.]" Pl.'s Opp. at 13, 15, 19, 27. Although Miller has assessed the provision of medical care as routine or inadequate, his disagreement with the medical provider about his medical needs is not sufficient to raise a genuine issue of fact that a medical provider should be liable for an Eighth Amendment violation. See Grays v. McGrain, 333 F. Supp. 3d 225, 234 (W.D.N.Y. 2018) (citing cases finding disagreement with treatment insufficient to establish basis of Eighth Amendment violation).

Construing the record most favorably to Miller, the defendants may be liable for at most mere medical malpractice, which is insufficient to support an Eighth Amendment violation. Chance, 143 F.3d at 703 ("[M]ere medical malpractice is not tantamount to deliberate indifference," unless "the malpractice involves culpable recklessness, i.e., a conscious disregard of a substantial risk of serious harm.") (internal quotation marks and citation omitted). Notably, Miller has failed to come forward with evidence upon which a reasonable jury could find that either defendant acted with culpable recklessness by consciously disregarding a substantial risk of harm to Miller due to his

mental health prescriptions. In fact, Miller's own evidence indicates that he was afforded medical attention for his symptoms of a sore throat and difficulty breathing, which had subsided after three weeks; and that another medical provider later assessed his low blood cell count as benign leukopenia. (Pl.'s Opp. at 46-50, 52). Accordingly, the present record shows that Miller received medical attention when he complained about his medical concerns and that Miller's claims against the defendants arise from his own assessment about the adequacy of the treatment provided.

Because no reasonable jury could determine based on the record before the court that Dr. Zahedi acted with deliberate indifference to a substantial risk of serious harm, the Motion for Summary Judgment must be granted in his favor. For the same reasons, the record evidence shows that Miller cannot sustain a plausible claim against APRN Lafrance. Accordingly, Miller's claim against APRN Lafrance must be dismissed as not plausible under 28 U.S.C. 1915(e)(2)(B)(i)-(iii).

## V.     Conclusion

For the foregoing reasons, the defendants' Motion for Summary Judgment (Doc. No. 52) is GRANTED as to Dr. Zahedi. Pursuant to 28 U.S.C. 1915(e)(2)(B)(i)-(iii), Miller's claim against APRN Lafrance is DISMISSED as not plausible as shown by the present record. Accordingly, the Clerk is instructed to close this case.

**SO ORDERED.**

Dated at New Haven, Connecticut this 23rd day of June 2021.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge